IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DANIELA MACADDINO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| INLAND AMERICAN RETAIL | ) JURY DEMAND |
| MANAGEMENT LLC, a Delaware limited | ) |
| liability company, INLAND AMERICAN | ) |
| HOLDCO MANAGEMENT, LLC, a | ) |
| Delaware limited liability company, and | ) |
| DAVID SOLGANIK, an individual, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

Plaintiff Daniela Macaddino, by her attorneys, The Law Offices of Ruth I. Major PC, for her Complaint against Defendants Inland American Retail Management LLC, Inland American HOLDCO Management LLC (the "Corporate Defendants"), and David Solganik (the "Individual Defendant") alleges as follows:

## INTRODUCTION

1. Plaintiff Daniela Macaddino ("Plaintiff" or "Ms. Macaddino"), worked as a Vice President/Leasing Director for the Corporate Defendants. During her employment with the Corporate Defendants, Ms. Macaddino was subjected to pervasive and denigrating sexually charged comments (many made by Mr. Solganik, the Individual Defendant), was forced to work in an environment that was openly hostile towards women, lost out on advancement opportunities because of her gender, and was compensated at a substantially lower rate than male employees in similar positions.

1

2. When Ms. Macaddino reported the troubling conduct that was affecting her work environment, the Defendants quickly retaliated by, *inter alia,* giving her false poor performance evaluations despite her exemplary performance, creating a "paper trail" by giving her, for the first time, baseless disciplinary memorandums, subjecting her to heightened scrutiny, interfering with her work by not giving her timely approval of her deals or adding layers of additional paperwork that were required only of her, denying her essential opportunities provided to other employees, and, eventually, terminating her employment.

## PARTIES

3. Plaintiff Daniela Macaddino, a female, is a citizen of Illinois. She was employed by the Corporate Defendants from August 2004 through August 2011. At all times relevant hereto, Ms. Macaddino worked out of the Corporate Defendants' office in Oak Brook, Illinois.

4. Defendant Inland American Retail Management LLC ("Inland American Retail") is a limited liability company incorporated in the state of Delaware whose sole member is Inland American HOLDCO Management, LLC. Its principal office is located at 2901 Butterfield Road, Oak Brook, Illinois. Inland American Retail is one of four management companies of Defendant Inland American HOLDCO Management, LLC.

5. Defendant Inland American HOLDCO Management, LLC ("Inland American HOLDCO") is a limited liability company incorporated in the state of Delaware, with its principal office located at 2901 Butterfield Road, Oak Brook, Illinois. Inland American HOLDCO leases and manages commercial properties, and, as of August 2011, had approximately 140 employees. It is the largest non-publicly traded Real Estate Investment Trust in the country.

6. Defendant David Solganik, a male, is a citizen of Illinois. At all times relevant, Mr. Solganik was the Director of Leasing for Inland American Retail and has worked out of Defendants' office in Oak Brook, Illinois since June 2009.

## JURISDICTION AND VENUE

7. This action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

8. Ms. Macaddino timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against Inland American Retail on January 26, 2012 (EEOC No. 440-2012-00285) within 300 days of the commission of the unfair employment practices. Ms. Macaddino filed an Amended Charge of Discrimination on March 5, 2012, adding Inland American HOLDCO and Inland American Business Management as respondents. A true and correct copy of the Charges of Discrimination are attached hereto as Exhibit A. On August 6, 2012, Ms. Macaddino received a Right to Sue Letter from the EEOC, a true and correct copy of which is attached hereto as Exhibit B. Plaintiff has exhausted all available administrative remedies under Title VII and has no further plain, speedy, adequate remedy in the ordinary course of law.

9. Jurisdiction is conferred on this Court by the above-named statute and 28 U.S.C. §§ 1331, 1367.

10. This action properly lies in the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391(b), in that Ms. Macaddino performed her employment duties almost exclusively within the State of Illinois; Defendant Inland American Retail is a Delaware limited liability corporation with its principal office in Illinois, its sole member, Inland American HOLDCO incorporated as a limited liability corporation in Delaware with its principal office in

Illinois. Inland American HOLDCO is held by the Inland Real Estate Group, Inc., Inland Real Estate Acquisitions, Inc. (both incorporated in Illinois), and Inland Real Estate Investment Corporation (incorporated in Delaware); Defendant David Solganik is a citizen of Illinois; the claims arose in this judicial district; and many of the relevant witnesses are located in Illinois.

## FACTS

11. Ms. Macaddino began working for entities of the Inland Real Estate Group of Companies (the principals of which control the three corporate members of Inland American HOLDCO) in August of 2004. Initially hired as a Leasing Manager for Inland Continental, Ms. Macaddino quickly proved herself to be capable, motivated, and successful, and numerous promotions followed.

12. By September 2007, Ms. Macaddino had been promoted to Vice President/Leasing Director for Inland American Retail, which is held by Inland American HOLDCO.

13. In late 2006, prior to Ms. Macaddino's transition to work primarily with Real Estate Investment Trust ("REIT") properties, Tom Lithgow (then Senior Vice President of Property Management; currently President and CEO of Inland American HOLDCO) advised Ms. Macaddino of an opening for the position of Director of Leasing for Inland American over their retail, office, and industrial properties. Based on Ms. Macaddino's strong track record, and the fact that she was already essentially performing the duties of this position, Mr. Lithgow strongly encouraged Ms. Macaddino to apply for the position.

14. However, before she had the chance to pursue the position, Ms. Macaddino learned that Tom McGuinness, CEO of Inland American HOLDCO, had hired a male friend of his, David Solganik, for the position. Prior to his transfer in March 2007, Mr. Solganik had been

working at an Inland subsidiary located in Charlotte, North Carolina. Mr. Solganik permanently relocated to Illinois to work out of the Corporate Defendants' Oak Brook office in June of 2009.

**Defendants Saturated Ms. Macaddino's Work Environment with Sexually Charged and Hostile Comments and Conduct**

15. Prior to the hiring of Ms. Solganik, Ms. Macaddino experienced discriminatory and denigrating comments while working for the Corporate Defendants. Examples of the Corporate Defendants' conduct includes, *inter alia*, Mr. McGuinness asking Ms. Macaddino if she had ever been in a wet t-shirt contest; Joe Cosenza, Vice Chairman/Direct of the Inland Group and President of Inland Real Estate Acquisitions, Inc. talking openly during staff meetings that he "loves mini-skirts" and preferred female employees of the Corporate Defendants wear them to work; Bob Baum, Inland's General Counsel and Vice Chairman of the Inland Group and Mr. Cosenza regularly telling off-color jokes at the general staff meetings; senior management asking to hire "hot girls;" Doug Leeds, Leasing Director, openly stating that "the worst comment one can make is that you negotiate like a girl."

16. This conduct, however, was not part of Ms. Macaddino's regular work environment. This changed with the hiring of Mr. Solganik.

17. Immediately after Mr. Solganik was hired in late 2006, Ms. Macaddino began to receive unsolicited reports from several of Mr. Solganik's former male direct reports regarding Mr. Solganik's reputation as a manager who treated women substantially less favorably than men. Mr. Solganik's former male reports considered his reputation to be so negative that they described him as a "sexist pig." Despite these warnings, Ms. Macaddino hoped things would work out with Mr. Solganik, and that he would not interfere with her ability to perform at the same high level of success under him as she had thus far.

18. In mid-2007, Ms. Macaddino started reporting to Mr. Solganik. Mr. Solganik immediately began what would become years of inappropriate, offensive, hostile, and denigrating sexual comments and discriminatory treatment.

19. Examples of the comments that Ms. Macaddino faced regularly include: Mr. Solganik asking Ms. Macaddino what kind of sex toys she enjoyed; commenting that women are a "nuisance" and a "liability" because in his opinion, "you train them, they get married, and then they get pregnant and leave;" asking Ms. Macaddino whether she would have sex with one of Inland's owners for a million dollars; bragging about "getting women" on Craigslist; openly gossiping with his subordinates about his boss' extramarital affair with a female co-worker; joking about fathering his former administrative assistant's child; planning a department meeting luncheon, with Mr. Lithgow's help, at Hooters restaurant; stating that women's groups such as CREW (Commercial Real Estate Women) were "stupid;" and claiming that women had the upper hand in business because they could use their sexuality to convince men to do anything, including to close deals, because "men love that" (these comments were made several times from 2007 through 2010). None of these comments were invited by Ms. Macaddino or otherwise encouraged by her.

20. Similarly situated male employees were not subjected to the same denigrating comments.

21. Mr. Solganik also treated Ms. Macaddino with less respect than her male counterparts, and even those males at a lower level than her, not at a Vice President level. For example, on one occasion, Mr. Solganik commented to Mike Faraone, Director of Operations for Inland American HOLDCO, when Mr. Faraone had made copies of documents, "Why are you making copies? Are you going to put on a skirt and mascara now, to completely turn into an

6

admin? Don't you know that's why we have the girls?" After explaining that Mr. Faraone should not perform administrative functions, Mr. Solganik then turned to Ms. Macaddino, who was at a higher level than Mr. Faraone and Doug Leeds, and, in Mr. Faraone's earshot, said "mail these to Doug [Leeds]." In 2011, Jeff Howard, a Vice President for Inland Commercial Property Management, commented while at work that he was excited about the opening of the Tilted Kilt restaurant, which, according to him, is like "Hooters with a Scottish twist," and that he was sure it would become a regular hang out for the male employees of the Corporate Defendants.

22. Women leasing directors of the Corporate Defendants, with few exceptions, were also paid substantially less than their male counterparts. Mr. Howard bragged in 2011 (and many times after that) to Ms. Macaddino that her income was only 50% of his income, and told Ms. Macaddino that because of the sexually discriminatory attitudes of Inland's management, Ms. Macaddino could expect to always earn less than her male counterparts.

23. Further, Mr. Solganik consistently treated her counterpart, Doug Leeds, with more respect than Ms. Macaddino. Mr. Leeds was treated like a professional though he was newer to the position and did not have the Vice President title.

**Ms. Macaddino Felt Compelled to Report the Conduct to Human Resources**

24. Initially, Ms. Macaddino reported the sexually discriminatory conduct to which she was subjected to Mr. Lithgow. Mr. Lithgow told Ms. Macaddino that "no one is going to care," and that Mr. Solganik, the male friend of the CEO, would not be going anywhere.

25. In or around June 2010, when Mr. Solganik's inappropriate behavior escalated, Ms. Macaddino attempted to address the issues directly with Mr. Solganik. In response, Mr. Solganik screamed at her, slammed the door immediately behind her, and then intensified his

7

hostile and discriminatory behavior. Sandy Berg, Senior Leasing Assistant to Ms. Macaddino, and Thee Love, an accountant, both witnessed Mr. Solganik slam the door behind Ms. Macaddino. Ms. Macaddino was warned by some of her colleagues that Mr. Solganik was trying to make her life a "living hell" in an attempt to make her quit.

26. Despite being officers for the Corporate Defendants, neither Mr. Lithgow nor Mr. Solganik ever reported Ms. Macaddino's complaints.

27. Shortly after her unsuccessful attempt to resolve the issue directly with Mr. Solganik, Ms. Macaddino made a formal complaint to the Human Resources department.

28. Speaking first with Nora O'Connor in Human Resources, Ms. Macaddino described the behavior to which she and other women working for the Corporate Defendants and with Mr. Solganik were subjected. A few days later, Ms. Macaddino was asked to meet alone with Mr. McGuinness. Ms. Macaddino's comments were met with glares, and not a trace of concern. Prior to that point, Mr. McGuinness had never responded to Ms. Macaddino in a negative manner.

29. Ms. Macaddino was never given any formal documentation confirming that action had been taken against Mr. Solganik as a result of her complaint. She was told that a meeting would take place with Human Resources and Mr. Solganik, Mr. Lithgow, and Mr. McGuinness to discuss how the parties would work together going forward. The meeting was never scheduled despite Ms. Macaddino's repeated requests for the meeting.

30. After the investigation was concluded, nothing changed for the better. The Corporate Defendants refused to adjust their conduct to comply with federal law and the work environment remained the same. Male executives brazenly continued to make sexually charged

8

inappropriate comments which reduced their female colleagues to sex objects. The comments were widespread and came from the top down.

31. For example, despite Ms. Macaddino's complaint, Dan Goodwin, Chairman and CEO of the Inland Group of Companies, made public statements before the top executives of the Corporate Defendants that denigrated women. Specifically, during an officers' meeting in or around the Spring of 2011, with approximately 150 employees in attendance, 50 of which were women, Mr. Goodwin interrupted the meeting to ask, in front of everyone, who is that "new blonde" from accounting, referencing a woman who was in attendance. Mr. Goodwin then made the new employee stand up while he gawked at her in front of all the attendees, and exclaimed that she was "more attractive than [actress] Renee Zellweger." The head of the Human Resources department was in attendance at the meeting, as was the Corporate Defendants' general counsel.

32. Other examples include Mr. Solganik and Mr. McGuinness conducting a conversation in 2011 in the workplace regarding a female car sales associate's body, commenting that she looked androgynous, and that her body was "weird" because she was flat-chested like a bodybuilder. Additionally, in 2010, Mr. McGuinness told Tiffany Hoffman, Property Manager for American REIT, that he saw her at a social function and could tell she was really cold, while gesturing to her chest and then making repeated inappropriate comments in that regard.

33. Despite the outrageous sexual comments by high level male executives at the Corporate Defendants and despite the inequity in the compensation and opportunities relating to gender, at no time during Ms. Macaddino's employment with Defendant Inland American Retail, did the Corporate Defendants provide their employees with sexual harassment or sex

9

discrimination training. The Defendants showed no interest in complying with federal laws prohibiting discrimination based on gender.

### Defendants' Retaliatory Campaign Against Ms. Macaddino

34. Not only did the Defendants fail to correct their behavior, but they also began to retaliate against Ms. Macaddino for making her complaint by stripping her of responsibilities and depriving her of vital opportunities, including, *inter alia*, prohibiting Ms. Macaddino from attending business meetings she had previously attended that were relevant to her job and her continued success at Inland (and then refusing to provide her with the information she missed); not providing answers to questions or other information that Ms. Macaddino required in order to perform her job; unjustifiably withdrawing approval of her deals (including Mr. McGuinness' withdrawal of approval from a large deal with Best Buy within one week of Ms. Macaddino's complaint in July 2010. Ms. Macaddino was eventually able to salvage this deal); and requiring an unprecedented and heightened level of paperwork prior to approving her deals while her male counterpart, Mr. Leeds, obtained approval without having to submit the same level of paperwork. Despite Ms. Macaddino voicing her concerns about these issues, they were never addressed.

35. Mr. Solganik also subjected Ms. Macaddino's performance to heightened unwarranted scrutiny. Mr. Solganik permitted Mr. Leeds to work his sales territory remotely from home with no supervision for over two and a half years. In sharp contrast, Mr. Solganik forced Ms. Macaddino to give up her most lucrative Texas territory, as he now required her (unlike Mr. Leeds) to physically reside in that territory if she wanted to keep it.

36. Mr. Solganik also prohibited Ms. Macaddino from working on any large retail store ("big-box") lease renewals, while allowing Mr. Leeds to continue to do so, and further, cut the number of properties she managed in half. Ms. Macaddino was also now required to use

vacation time for doctors' appointments, and was prohibited from bringing her laptop to meetings.

37. Despite Ms. Macaddino's impressive record as the top producer for Inland American HOLDCO, officers for the Corporate Defendants and other Inland entities further retaliated against Ms. Macaddino by ignoring her openly expressed interests to interview for promotions during the spring of 2010 and again in late 2010/early 2011.

38. Defendants' animus against Ms. Macaddino was further expressed through unjustified scathing performance reviews (in a March 29, 2011 review, Mr. Solganik questioned both her ethics and integrity) and disciplinary memoranda in mid-2011, as Defendants appeared determined to create a "paper trail" to support the termination, which was imminent. As an example, in a May 26, 2011 Final Written Warning, Ms. O'Connor accused Ms. Macaddino of being unresponsive and lacking knowledge when communicating with clients, and being inappropriate and unprofessional with interacting with Ms. Macaddino's brokers. Ms. O'Connor knew that the accusations against Ms. Macaddino were untrue.

39. In June 2011, under the guise of offering Ms. Macaddino relief from Mr. Solganik's relentless attacks, the Corporate Defendants directed that Ms. Macaddino would now report to a new direct supervisor, Teri Young, a Senior Vice President of Property Management and executive member of the Deal Committee. Ms. Macaddino was concerned about reporting to Ms. Young because Ms. Young was close friends with Mr. Solganik but publicly Ms. Macaddino tried to make the best of the new assignment.

40. Although Ms. Macaddino hoped that the new assignment might result in a better work environment for her, it soon became obvious that was not to be. Instead, Ms. Young was clearly placed as Ms. Macaddino's new supervisor for the sole purpose of serving as Solganik's

11

proverbial "cat's paw." Ms. Young carried the torch for Mr. Solganik as she continued the pattern of harassment on Mr. Solganik's behalf by, *inter alia*, falsely criticizing Ms. Macaddino's work, micromanaging Ms. Macaddino when similarly situated male managers were not so micromanaged, and directing Ms. Macaddino to act as a subordinate to Ms. Berg, Ms. Macaddino's own assistant.

41. Further, as Mr. Solganik was still in charge of all the leasing efforts for the REIT, the new layer of management between Ms. Macaddino and Mr. Solganik gave the appearance that Ms. Macaddino had been demoted. The Corporate Defendants pretended that Ms. Macaddino worked for Ms. Young, who reported to Mr. Lithgow, but Mr. Solganik was still responsible for all of leasing, so this was merely an attempt to create a "paper trail" to make it appear as though the Corporate Defendants were trying to solve the problem. Ms. Young had not been part of the leasing for the Inland American Real Estate Investment Trust entities since their inception, making it illogical for Ms. Macaddino to report to Ms. Young.

42. As her standing with the Corporate Defendants deteriorated, Ms. Macaddino also lost the support of various colleagues and administrative staff. Many witnessed firsthand Ms. Macaddino's mistreatment and reported to Ms. Macaddino that they feared becoming a victim of similar retaliatory action.

43. By the end of August 2011, it became clear that despite the Defendants' relentless campaign against Ms. Macaddino, she could not be forced to resign her position. On Monday, August 29, 2011, the Defendants terminated Ms. Macaddino's employment.

44. In an effort to disguise its baseless and unlawful termination, Defendants cited in the termination memorandum, sent to Ms. Macaddino from Ms. Young, Ms. Macaddino's alleged "push back" and "bullying" as justification for ending her employment and made

numerous false allegations concerning Ms. Macaddino, including, *inter alia*, falsely alleging that Ms. Macaddino refused to participate in calls with Ms. Young and Ms. Macaddino's brokers in July 2011 when Ms. Young was well aware that this statement was false, and that Ms. Macaddino did not "refuse" to participate in these calls, but simply asked to discuss concerns she had that these calls would seriously undermine Ms. Macaddino's authority with her brokers. The memo also falsely alleged that Ms. Macaddino did not respond to Ms. Young's requests for Ms. Macaddino's travel schedule for a conference in Orlando when Ms. Macaddino provided Ms. Young with a printed copy of her schedule. Another example of the memo's false allegations accuses Ms. Macaddino of filing a false insubordination claim against her assistant, Ms. Berg, and claims that Ms. Macaddino failed to provide specific examples of how Ms. Berg was insubordinate. However, Ms. Macaddino had a conversation with both Ms. Young and Mr. Lithgow during which she clearly communicated the various ways Ms. Berg was being insubordinate. The allegations in the termination memorandum were untrue and were known to be untrue by Ms. Young and Defendants.

**COUNT I – Defendants' Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e *et seq.*, for Unlawful Sex Discrimination
(against Corporate Defendants)**

45.     Ms. Macaddino restates and realleges by reference paragraphs 1 through 44 as paragraph 45 of Count I.

46.     Defendants are employers within the meaning of 42 U.S.C. § 2000e-5, in that they engage in an industry affecting commerce, and employ more than 15 regular employees.

47.     Ms. Macaddino was discriminated against in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

48. Male employees were not subject to the adverse and discriminatory conduct described.

49. The aforementioned adverse conduct was done with malice and/or a reckless indifference for Ms. Macaddino's federally protected rights.

50. At all times material hereto, Ms. Macaddino performed at or above Defendants' legitimate expectations.

**WHEREFORE** Plaintiff Daniela Macaddino respectfully requests the entry of judgment in her favor and against Defendants as follows:

A. An award of damages for back pay, front pay, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial;

C. Punitive damages;

D. An award to Plaintiff for reasonable attorneys' fees and costs; and

E. All other relief this Court deems just.

**COUNT II – Defendants' Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e *et seq.*, for Unlawful Sexual Harassment
(against Corporate Defendants)**

51. Ms. Macaddino restates and realleges by reference paragraphs 1 through 44 as paragraph 51 of Count II.

52. Ms. Macaddino was subject to hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

53. Defendants are employers within the meaning of 42 U.S.C. § 2000e-5, in that they engage in an industry affecting commerce, and employ more than 15 regular employees.

54. Defendants engaged in severe and pervasive behavior based on sex that created an abusive work environment such that it affected the terms and conditions of Ms. Macaddino's employment.

55. The aforementioned adverse conduct, including but not limited to, comments about female employees' level of attractiveness, bragging about extramarital affairs, and inappropriate statements regarding sex toys, mini-skirts and wet t-shirt contests, was done with malice and/or a reckless indifference for Ms. Macaddino's federally protected rights.

**WHEREFORE** Plaintiff Daniela Macaddino respectfully requests the entry of judgment in her favor and against Defendants as follows:

A. An award of damages for back pay, front pay, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial;

C. Punitive damages;

D. An award to Plaintiff for reasonable attorneys' fees and costs; and

E. All other relief this Court deems just.

**COUNT III – Defendants' Violation of Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e *et seq*., for Unlawful Retaliation
(against Corporate Defendants)**

56. Ms. Macaddino restates and realleges by reference paragraphs 1 through 44 as paragraph 56 of Count III.

57. Ms. Macaddino was subjected to retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.

58. Defendants are employers within the meaning of 42 U.S.C. § 2000e-5, in that they engage in an industry affecting commerce, and employ more than 15 regular employees.

59. Ms. Macaddino expressed her concern for the unlawful discrimination to which she was being subjected and in response, Defendants intensified its mistreatment of her. Ms. Macaddino was unfairly criticized, stonewalled when she attempted to get assistance in moving her deals forward, lost opportunities, and ultimately, was terminated as a result of her federally protected activity. Other employees of the Corporate Defendants who did not engage in protected activity under Title VII were not treated this way.

60. The aforementioned conduct was done with malice and/or a reckless indifference for Ms. Macaddino's federally protected rights.

**WHEREFORE** Plaintiff Daniela Macaddino respectfully requests the entry of judgment in her favor and against Defendants as follows:

A. An award of damages for back pay, front pay, and other equitable relief;

B. An award of compensatory damages in an amount to be proven at trial;

C. Punitive damages;

D. An award to Plaintiff for reasonable attorneys' fees and costs; and

E. All other relief this Court deems just.

### COUNT IV – Tortious Interference with Business Relations
### (against Defendant David Solganik)

61. Ms. Macaddino restates and realleges by reference paragraphs 1 through 44 as paragraph 61 of Count IV.

62. Ms. Macaddino employment with the Inland Groups was a valid business relationship for which she had a reasonable expectancy would continue.

63. Mr. Solganik was aware of Ms. Macaddino's employment with the Inland Groups, and acted with malice when he intentionally and unjustifiably induced the Inland Groups to terminate Ms. Macaddino's employment.

64. Mr. Solganik acted in furtherance of his personal interests and against the interests of the Inland Groups when he intentionally interfered with Ms. Macaddino's business relations with the Inland Groups.

65. As a result of Mr. Solganik's unlawful interference, Ms. Macaddino suffered damages.

**WHEREFORE** Plaintiff Daniela Macaddino respectfully requests the entry of judgment in her favor and against Defendant as follows:

A. An award of compensatory damages in an amount to be proven at trial;

B. Punitive damages;

C. All other relief this Court deems just.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

**Dated**: October 29, 2012          **DANIELA MACADDINO**

/ s / Ruth I. Major
_____
One of Her Attorneys

Ruth I. Major (ARDC No. 6205049)
The Law Offices of Ruth I. Major P.C.
30 W. Monroe, Suite 1650
Chicago, Illinois 60603
Tel: (312) 893-7544
Fax: (312) 698-9867
rmajor@major-law.com