**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| DANIELA MACADDINO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 8655 |
| v. | ) | |
| | ) | Judge Joan H. Lefkow |
| INLAND AMERICAN RETAIL | ) | |
| MANAGEMENT, LLC, a Delaware | ) | |
| limited liability company; | ) | |
| INLAND AMERICAN HOLDCO | ) | |
| MANAGEMENT, LLC, a Delaware | ) | |
| limited liability company, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On October 29, 2012, plaintiff Daniela Macaddino filed suit against Inland American

Retail Management, LLC (IARM), Inland American HOLDCO Management, LLC (HOLDCO),

and David Solganik.  (Dkt. 1 (Compl.).)  Macaddino asserts claims against IARM and HOLDCO

for disparate treatment on the basis of sex, sexual harassment and the creation of a hostile work

environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §§ 2000e *et seq.*  (*Id.*)  Macaddino also brought a claim against Solganik for tortious

interference with business relations.  (*Id.*)  Pursuant to a stipulation of voluntary dismissal (dkt.

130), the court dismissed the claim against Solganik with prejudice on June 3, 2014 (dkt. 132).

On August 8, 2014, IARM and HOLDCO (collectively, "defendants") moved for summary

judgment pursuant to Federal Rule of Civil Procedure 56 with respect to the three claims filed

against them. (Dkt. 135.) For the reasons stated below, defendants' motion is granted in part and denied in part.[1]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex*, 477 U.S. at 323–24.

---

[1] The court has jurisdiction under 28 U.S.C. § 1331. Venue is appropriate in this district under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

# BACKGROUND[2]

## I.    Parties

HOLDCO is a limited liability company that maintains its principal office in Oak Brook, Illinois.  (Dkt. 137 ("Defs.' L.R. 56.1") ¶ 5.)  HOLDCO, through its wholly owned entities, leases and manages commercial and residential properties.  (*Id.*)  HOLDCO is the sole member of IARM.  (*Id.* ¶ 4.)

IARM is a limited liability company that, like HOLDCO, maintains its principal office in Oak Brook, Illinois.  (*Id.*)  IARM serves as a rent payee, deals with property management issues, and acts as an agent for property owners in negotiating and executing leases.  (*Id.*)

Macaddino is a citizen of Illinois who prior to 2007 was employed as a Leasing Manager for an entity related to HOLDCO and IARM.[3]  (*Id.* ¶ 6; Compl. ¶ 11.)  Macaddino was appointed Vice President of IARM in September 2007 and was employed as a Leasing Director at HOLDCO from December 2007 to August 29, 2011.  (Defs.' L.R. 56.1 ¶ 6.)  At her deposition, Macaddino testified that while she "was made an officer of" IARM in 2007, she "received a paycheck from . . . HOLDCO" throughout the course of her employment.  (Dkt. 138-1 ("Macaddino Dep.") at 123: 5–6, 9–10.)

---

[2] Unless otherwise noted, the facts in the background section are taken from the parties' Local Rule 56.1 statements and are construed in the light most favorable to Macaddino.  The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage."  *Omnicare*, 629 F.3d at 704 (citation omitted).  In accordance with its regular practice, the court has considered the parties' objections to the statements of fact and includes in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion.  For this reason, defendants' request to strike certain paragraphs contained in Macaddino's Local Rule 56.1 response is denied as moot.  Any facts that are not controverted as required by Rule 56.1 are deemed admitted.

[3] According to Macaddino's response brief, HOLDCO and IARM are part of a consortium of companies under the Inland banner.  (Dkt. 143 at 2.)

## II.     Other HOLDCO Employees

During Macaddino's time as Leasing Director, Thomas McGuiness served as HOLDCO's President.[4]  (Defs.' L.R. 56.1 ¶ 7.)  Thomas Lithgow, Teri Young, and David Solganik were three of HOLDCO's senior vice presidents.[5]  (*Id.* ¶¶ 7–8.)  Solganik also served as Director of Leasing, and from 2007 through May 2011, Solganik was Macaddino's direct supervisor.  (*Id.* ¶ 8.)  At the time of his hiring, Solganik had more than twenty-five years of commercial leasing experience.  (*Id.*)

In 2009, HOLDCO hired Doug Leeds as a Leasing Director.  (*Id.* ¶ 9.)  Leeds was appointed an officer of IARM on October 24, 2011 (dkt. 145 ("Pl.'s L.R. 56.1") ¶ 20.) and was terminated in March 2012 (Defs.' L.R. 56.1 ¶ 9.)  Sandi Berg worked as Macaddino's administrative assistant from 2009 through the date of Macaddino's termination.  (*Id.* ¶ 10.)  During Macaddino's employment, Nora O'Connor was President of Inland Human Resource Services, Inc., which provided human resources services to HOLDCO.  (*Id.* ¶ 40.)

## III.     Macaddino's Duties and Compensation

As a Leasing Director, Macaddino was responsible for finding new tenants for commercial properties that HOLDCO leased and managed.  (*Id.* ¶ 12.)  Consequently, Macaddino needed to be an expert in her market and visit her properties often.  (*Id.*)  In addition, Macaddino was charged with locating brokers who were knowledgeable about the markets in which the properties were located.  (*Id.*)  These brokers advised Macaddino "and other HOLDCO Leasing Directors on local market conditions and identified and assessed prospective customers for leasing opportunities."  (*Id.* ¶ 13.)

---

[4] Macaddino disagrees and contends that McGuiness was HOLDCO's CEO, not its President. (Dkt. 146 ("Pl.'s L.R. 56.1 Resp.") ¶ 7.)  The disagreement is not material.

[5] Macaddino asserts that Lithgow served as HOLDCO's President, rather than as a senior vice president, during her employment.  (*Id.*)  The disagreement is not material.

HOLDCO Leasing Directors earned a base salary plus bonuses based on the number of properties leased and the square footage of those properties. (*Id.* ¶ 14.) In an affidavit, Lithgow stated that as of July 1, 2009, "the maximum bonus per calendar year for Leasing Directors . . . was equal to 100% of their base salary." (Dkt. 138-6 ¶ 6.) According to Lithgow, however, that cap was not enforced with respect to Macaddino or any other Leasing Director at HOLDCO. (*Id.*) Indeed, Macaddino's bonuses were consistently higher than her base salary. (*See* Defs.' L.R. 56.1 ¶¶ 31, 33–34.) Moreover, Macaddino was the highest-paid Leasing Director at HOLDCO during the entirety of her employment. (*Id.* ¶ 30.) In 2010, Macaddino's last full year of employment, Macaddino's compensation was the second highest among all HOLDCO employees. (*Id.*)

IV. **Lease Approval**

During his deposition, Lithgow testified that in 2009 or 2010 HOLDCO implemented a formal procedure for deal approval.[6] (Dkt. 138-2 at 65.) Pursuant to this procedure, leases that met certain specifications set by the Asset Management Department were automatically approved without further review. (Defs.' L.R. 56.1 ¶ 18.) Leases that did not meet the specifications, however, required additional documentation and review by a Deal Committee composed of Asset Management and HOLDCO executives. (*Id.* ¶¶ 17, 19.) Leasing Directors participated in Deal Committee discussions and advocated for approval of their deals. (*Id.* ¶ 19.) Macaddino attests that leases she "negotiated had to be approved by management, sometimes by [her] supervisors, and sometimes by committees" during her employment. (Dkt. 144-1 ¶ 8.) With the exception of 2011, Macaddino had more leases approved than any other HOLDCO Leasing Director. (Defs.' L.R. 56.1 ¶ 25.)

_____

[6] Throughout their briefs, the parties use the word "deal" to refer to a proposed lease or lease renewal. The court adopts that terminology.

## V.      HOLDCO's Harassment and Discrimination Policies

In late 2009, HOLDCO introduced a new employee handbook.  (*Id.* ¶ 38.)  The handbook included company policies on discrimination and sexual harassment in the workplace and provided procedures for reporting complaints.  (*Id.*)  In September 2010, HOLDCO held a meeting with all supervisory personnel and reminded the individuals in attendance of HOLDCO's "zero tolerance" for sexual harassment.  (*Id.*)  Employees discussed examples of sexual harassment and received information detailing the manner in which incidents of sexual harassment were reported and investigated.  (*Id.*)  Macaddino received an invitation to this meeting and was familiar with HOLDCO's discrimination and harassment policies.  (*Id.* ¶ 39.)

## VI.     Macaddino's Complaints of Disparate Treatment and Harassment

Macaddino alleges that throughout her employment with IARM and HOLDCO, she experienced harassment and discrimination in the workplace.  In 2005 or 2006, and again in 2007 or 2008, McGuinness asked Macaddino if she had ever participated in a wet t-shirt contest.  (*Id.* ¶ 41.)  Prior to 2010, a corporate executive made jokes about mini-skirts and hiring "hot girls" and, in 2009, Leeds stated that one of the worst insults you can receive is "that you negotiate like a girl."  (*Id.*)  Macaddino complained to Lithgow in 2009 and informed him that Solganik interacted with her in an inappropriate manner by slamming doors and throwing leases on the floor.  (*Id.* ¶ 42.)  According to Macaddino, Solganik did not behave in this manner with Leeds or any other male employees.  (*Id.*)  Macaddino also told Lithgow that Solganik had made inappropriate comments such as discussing an affair between other HOLDCO employees, asking Macaddino if she would sleep with someone in exchange for $1 million, and making negative comments about the Commercial Real Estate Women organization.  (*Id.* ¶ 43.)  As a result of Macaddino's complaints, Lithgow gave Solganik a verbal warning.  (*Id.*)

In addition to the conduct Macaddino reported to Lithgow, Solganik made additional comments to Macaddino prior to 2011. In 2010, Solganik asked Macaddino what types of sex toys she enjoyed, and in 2007 and 2009, Solganik commented that women are "a nuisance" because "you train them, they get married, and then they get pregnant and leave." (*Id.* ¶ 44.) In 2008 or 2009, Solganik bragged about "getting women" on Craigslist and, from 2007 to 2010, Solganik gossiped with his subordinates about his boss' extramarital affair with a female co-worker. (*Id.*) From 2007 to 2010, Solganik joked about fathering his former administrative assistant's child, and in 2008 or 2009, Solganik, with Lithgow's assistance, planned a department meeting at a Hooters restaurant. (*Id.*) Further, in 2009 or 2010, Solganik commented that women have the upper hand in business deals because they can use their sexuality to convince men to do anything. (*Id.*)

Macaddino also alleges that on several occasions, Solganik treated her with less respect than her male co-workers. For example, in 2009, Solganik stated to a male HOLDCO employee, "Why are you making copies? Are you going to put on a skirt and mascara now, to completely turn into an admin? Don't you know that's why we have the girls?" (*Id.* ¶ 45.) Then, within earshot of the male employee, Solganik asked Macaddino to mail something to Leeds. (*Id.*)

Macaddino placed a telephone call to O'Connor in 2009 informing her that she was experiencing unfair treatment but was afraid to come forward. (*Id.* ¶ 46.) O'Connor encouraged Macaddino to do so, and Macaddino made an appointment to meet with O'Connor. (*Id.*) Macaddino cancelled the appointment. (*Id.*) In June 2010, Macaddino contacted O'Connor again and informed her that Solganik was "saying inappropriate things, interfering with deals, throwing tantrums, slamming doors, escalating." (*Id.* ¶ 47.) Macaddino also complained that her

deals were subjected to greater scrutiny and were required to have more "backup" than Leeds' deals. (*Id.*) Macaddino was represented by counsel at this time. (*Id.*)

In response, O'Connor investigated Macaddino's complaints (*id.* ¶ 48) and authored a written document entitled "Timeline for Daniela Macaddino's June 2010 Complaint." (Pl.'s L.R. 56.1 ¶ 1.) In the course of her investigation, O'Connor interviewed McGuiness, Lithgow, Solganik, and Berg, and she reviewed documents pertaining to the lease-approval process at HOLDCO and the structure of the Deal Committee. (Defs.' L.R. 56.1 ¶ 51.) O'Connor concluded that the criteria used to evaluate deals were not discriminatory and that Macaddino's complaints of discrimination were not supported. (*Id.* ¶ 52.) Moreover, O'Connor could not corroborate Macaddino's complaints of sexual harassment. (*Id.* ¶ 53.) Nevertheless, she advised Lithgow to reprimand Solganik for the comments he made in 2009 and to warn him not to make further comments related to age, race, or gender. (Dkt. 138-3 ("O'Connor Dep.") at 190.) Lithgow did so shortly thereafter. (*Id.*)

O'Connor also asked HOLDCO management to investigate Macaddino's complaints regarding her deals. (Defs.' L.R. 56.1 ¶ 48.) Lithgow investigated and found that the Asset Management Department had placed more demands on HOLDCO as a whole. (*Id.* ¶ 49.) Lithgow informed Macaddino, however, that he could not corroborate her complaints of discrimination about deals. (*Id.* ¶ 50.) But Macaddino continued to believe that she was being treated less favorably than Leeds.

O'Connor testified that in conversations with McGuiness and Lithgow around this time, the three considered terminating Macaddino. (O'Connor Dep. at 142.) O'Connor expressed concern that if Macaddino were fired, she might file a claim for unlawful retaliation. (*Id.* at

144.) On June 30, 2010, O'Connor, Lithgow, and McGuiness discussed the possibility of transferring Macaddino to a related entity. (*Id.* at 142.)

Macaddino alleges that, following the investigations by O'Connor and Lithgow, she experienced additional sexual harassment in the workplace. (Defs.' L.R. 56.1 ¶ 55.) In 2011, an executive of a HOLDCO-related entity made a comment regarding a Tilted Kilt restaurant, and another executive commented at a meeting that a particular woman was more attractive than Renee Zellweger.[7] (*Id.*) That same year, McGuiness and Solganik had a conversation in Macaddino's presence regarding the androgynous nature of a female car sales associate's body. (*Id.*)

## VII. Macaddino's Performance Review, Complaints About Macaddino, and Macaddino's Change of Supervisor

HOLDCO employees did not receive written performance reviews in either 2009 or 2010.[8] (*Id.* ¶ 56.) In January 2011, however, HOLDCO conducted performance reviews, and Solganik scored Macaddino as a 5.6 on a ten-point scale—a "proficient" score. (*Id.*) Macaddino received the review in March 2011, and Solganik also provided Macaddino with specific performance concerns including her failure to follow the chain of command, her sarcastic and disrespectful attitude, her failure to complete department responsibilities in a timely manner, and her lack of communication regarding her travel and work schedules. (*Id.*) Macaddino did not receive a pay cut or demotion as a result of this review. (*Id.*)

---

[7] The complaint identifies these individuals as the Chairman and CEO of the Inland Group of Companies, of which HOLDCO and IARM are a part, and a Vice President of Inland Commercial Property Management, another related entity. (Compl. ¶¶ 21, 31.)

[8] Lithgow reviewed Macaddino in 2006 and 2007 and gave her "proficient" scores. (Pl.'s L.R. 56.1 ¶ 15.) Solganik also gave Macaddino a "proficient" score in 2008. (Dkt. 144-10 at PL 00210.) Macaddino received an increase in her base salary each of these three years. (Pl.'s L.R. 56.1 ¶ 15.)

In May 2011, Solganik received complaints about Macaddino from three brokers within Macaddino's territory. (*Id.* ¶ 57.) First, on May 6, 2011, broker Jerry Masiello emailed Solganik and complained about Macaddino's lack of communication. (*Id.* ¶ 58.) According to Masiello, Macaddino's behavior prevented him from responding knowledgeably to prospective tenants. (*Id.*) Second, on May 9, 2011, broker Kim Dart emailed Solganik and complained about Macaddino's "lack of response" and the "general flow of information regarding our deals." (*Id.* ¶ 59.) Dart also reported that Macaddino was "inappropriate and unprofessional." (*Id.*) Third, on May 11, 2011, broker J.R. Pitcairn emailed Solganik and stated that "since Inland reassigned Leasing Directors in this area, I have had virtually no communication with [Macaddino]. In fact, we have not even spoken over the telephone." (*Id.* ¶ 60.)

Solganik shared these complaints with O'Connor. (*Id.* ¶ 61.) Subsequently, O'Connor spoke to Dart, and Dart reiterated her complaints regarding Macaddino's lack of communication. (*Id.*) Moreover, Dart informed O'Connor that Macaddino had made negative comments about HOLDCO executives.[9] (*Id.*) On May 12, 2011, Macaddino received a written warning from Solganik for speaking "poorly about the way your employer conducts its business and how your deals are being turned down or overly scrutinized due to unfair treatment." (Dkt. 138-40.) The warning provided that the continuation of such behavior would "result in further disciplinary actions up to and including termination." (*Id.*) After Macaddino's attorney sent a letter requesting that the warning be removed and all documents pertaining to Macaddino's

---

[9] Macaddino disputes these allegations. (Pl.'s L.R. 56.1 Resp. ¶ 61.) The evidentiary materials to which Macaddino cites perhaps question the truthfulness of Dart's complaints, but they do not controvert the fact that the complaints were made. Thus, these facts are deemed admitted to show that complaints were made.

employment be preserved for litigation,[10] the warning was removed from Macaddino's

personnel file.  (Defs.' L.R. 56.1 ¶ 62; Pl.'s L.R. 56.1 ¶ 17.)  Macaddino received a revised

warning from O'Connor on May 28, 2011 for her lack of communication with brokers and for

making "inappropriate and unprofessional comments" to those brokers.  (Dkt. 138-26.)

    At the end of May 2011, Young replaced Solganik as Macaddino's supervisor.  (Defs.'

L.R. 56.1 ¶ 63.)  Young claims to have had no prior knowledge of Macaddino's complaints of

discrimination and harassment and claims to have never seen Macaddino's written warning that

had been removed from her personnel file.  (*Id.*)  Young stated that HOLDCO never informed

her of why she became Macaddino's supervisor.  (*Id.*)  According to Young, during the period of

time that she supervised Macaddino, she did not communicate with Solganik about Macaddino.

(*Id.* ¶ 65.)

## VIII.   Macaddino's Final Months at HOLDCO and Ultimate Termination

    On June 2, 2011, Macaddino's attorney informed HOLDCO's outside counsel that

Macaddino's transition to a new supervisor had been "rocky."  (*Id.* ¶ 66.)  O'Connor asked

Macaddino to identify specific problems she encountered including gender-based discrimination

or harassment.  (*Id.*)  Macaddino responded that she "would not be rehashing complaints from

the past at this time."  (*Id.* ¶ 67.)  She stated, however, that she disagreed with her most-recent

performance review and believed that Solganik continued to be involved with her deals.  (*Id.*)

Macaddino also reported that she would not receive a bonus on an unspecified deal and that her

colleagues "shunned" her.  (*Id.*)

---

[10] HOLDCO and IARM object to the contents of the letter sent by Macaddino's attorney as
hearsay.  The contents of the letter would be admitted, however, not for their truth, but to demonstrate
their effect on HOLDCO in removing the written warning from Macaddino's personnel file.  *See Cooper-
Schut* v. *Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (affirming district court decision to admit
statement for the effect that it had on the listener).

On June 14, 2011, O'Connor provided Macaddino with two memoranda. (*Id.* ¶ 68.) One assured Macaddino that Solganik had no role in her deal approvals and explained that Macaddino would not receive a bonus in connection with the deal mentioned above because the deal was a rent reduction, not a new lease. (*Id.*) The second memorandum provided additional information about Macaddino's performance review. (*Id.*) On June 22, 2011, O'Connor received a memorandum from Macaddino providing that "as long as [Solganik] is still involved in leasing activities, the change in my reporting relationship . . . is merely superficial and has not improved my situation." (*Id.*)

O'Connor responded in writing on June 30, 2011 and informed Macaddino that Solganik had no input in HOLDCO's decisions concerning Macaddino's deals or compensation. (*Id.* ¶ 69.) But Macaddino reiterated her belief that Solganik was still involved in her deals and also expressed concern that Berg, her administrative assistant, was working for Young and not her. (*Id.*) On July 19, 2011, O'Connor informed Macaddino in writing that neither of these concerns was justified.[11] (*Id.*) On August 4, 2011, Young informed O'Connor that she believed that Macaddino had been mistreating and harassing Berg. (*Id.* ¶ 72.)

Young testified that while she was initially hopeful that Macaddino's "employment situation" would improve, she subsequently determined that she "had no choice but to terminate [Macaddino's] employment." (Dkt. 138-4 at 243.) In July and August of 2011, Young prepared a memorandum detailing Macaddino's performance deficiencies in the areas of reliability, ethics and integrity, cooperation, job knowledge, written communication, judgment, interpersonal skills, organization and planning, and attendance and punctuality. (Defs.' L.R. 56.1 ¶ 70.) The memorandum explained, among other things, that Macaddino failed to return phone calls and

---

[11] Defendants state, "That same month, O'Connor received complaints from Voss and Mullins, both Leasing Managers, about Macaddino." (Defs.' L.R. 56.1 ¶ 71.) Plaintiff objects on the basis that the statements attributed to Voss and Mullins are hearsay, which they are and are therefore disregarded.

emails in a timely manner, did not get along with her peers, "selectively" responded to emails from Young, and arrived late to work on numerous occasions. (*See* dkt. 138-23 at 5–8.) The memorandum served as an attachment to Macaddino's August 2011 performance review document. (Defs.' L.R. 56.1 ¶ 70.) Young terminated Macaddino on August 29, 2011. (*Id.* ¶ 6.)

Macaddino worked under Young for merely three months before she was terminated. Young never completed a regular performance review of her work and never counseled her about deficiencies in her work. (Dkt. 146 ("Pl.'s L.R. 56.1 Resp.") ¶ 70.)

Macaddino filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against IARM on January 26, 2012. (Defs.' L.R. 56.1 ¶ 3.) She then filed an amended charge on March 5, 2012 adding HOLDCO as a respondent. (*Id.*) The EEOC issued a right to sue notice on August 2, 2012. (*See* dkt. 1-2.)

## ANALYSIS[12]

### I. Whether IARM is an "Employer" Within the Meaning of Title VII

Defendants contend that summary judgment should be granted with respect to all claims against IARM because IARM is not an "employer" within the meaning of Title VII. Title VII prohibits "employers" from discriminating against employees on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Accordingly, to survive summary judgment, Macaddino must show that IARM is an employer within the meaning of the statute.

Title VII defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." *Id.* § 2000e(b); *Komorowski* v. *Townline Mini-*

---

[12] In their reply brief, defendants request that the court grant summary judgment on the ground that Macaddino failed to comply with Federal Rule of Civil Procedure 56 and Local Rule 56.1 in her response. (Dkt. 148 at 4–5.) Although the argument is well taken in many respects, the court has done its best to winnow the facts to those supported by the record and declines to grant summary judgment on this basis. Plaintiff's counsel is advised to take this criticism to heart in future summary judgment filings.

*Mart & Rest.*, 162 F.3d 962, 965 (7th Cir. 1998). In determining whether an employment relationship exists between an individual and the alleged employer, courts apply the "the payroll method." *Mizwicki* v. *Helwig*, 196 F.3d 828, 831 (7th Cir. 1999) (citing *Walters* v. *Metro. Educ. Enters., Inc.*, 519 U.S. 202, 205–07, 117 S. Ct. 660, 136 L. Ed. 2d 644 (1997)). Pursuant to that method, a plaintiff must show "that at least fifteen employees were on the defendant's payroll for twenty weeks during the year of, or preceding, the alleged harassment." *Id.* at 832 (citations omitted); *see also Smith* v. *Castaways Family Diner*, 453 F.3d 971, 974 (7th Cir. 2006).

Defendants rely on the affidavit of O'Connor, who states that she is responsible for management of payroll services and related documentation for HOLDCO, that she has direct knowledge of the composition of IARM and HOLDCO, and that IARM has had no employees since its formation. (Dkt 138-9 ¶¶ 6, 9.) Macaddino concedes that her salary and related earnings were paid by HOLDCO. The only evidence Macaddino submits that IARM has at least fifteen employees is an IARM webpage listing IARM's number of employees as twenty. Other documents Macaddino points to do reflect that IARM holds itself out as having employees (a letter appointing Macaddino Vice President of IARM and indicating that her payroll status changed, Macaddino's business card which identifies Macaddino as Vice President of Leasing at IARM, and a magazine article which lists Macaddino as holding that same position). These do not establish that IARM employed at least fifteen employees for twenty weeks during any year of the relevant time period. Furthermore, Macaddino does not explain the materiality of this dispute of fact since HOLDCO is not denying that it is an employer and would be responsible to pay a judgment in this case. For these reasons, summary judgment must be granted with respect to the claims against IARM.[13]

---

[13] Picking up on a few statements in Lithgow's deposition, Macaddino suggests in her response brief that "the employment group in the interrelated companies is larger than the Defendants' portrayal

## II.    Time-Barred Claims

To bring a Title VII claim, a plaintiff must file a charge with the EEOC within 180 or 300 days of the alleged unlawful employment practice, depending on the state.  42 U.S.C. § 2000e-5(e)(1).  The charging period in Illinois is 300 days.  *Groesch* v. *City of Springfield*, 635 F.3d 1020, 1024 n.2 (7th Cir. 2011) (citations omitted).  Here, Macaddino filed a charge with the EEOC against IARM on January 26, 2012, and an amended charge on March 5, 2012, adding HOLDCO as a respondent.  Defendants contend that many of the incidents underlying Macaddino's disparate treatment and sexual harassment claims[14] are time-barred because they took place prior to April 1, 2011.[15]

Macaddino does not address this argument specifically with respect to each claim, and instead argues in her response brief that her "sex claims" are not time-barred because the claims are based on a series of acts that collectively constitute one unlawful employment practice.  (Dkt. 143 at 6.)  Generally, a plaintiff may only bring a Title VII suit if the conduct on which the lawsuit is based occurred within the 300-day limitations period.  An exception to this rule, however, is the "continuing violation doctrine."  *Hardin* v. *S.C. Johnson & Son, Inc.*, 167 F.3d 340, 344 (7th Cir. 1999).  That exception "is designed to accommodate plaintiffs who can show

---

can be inferred."  (Dkt. 143 at 5.)  "There are three situations in which the policy behind the exemption of the tiny employer is vitiated by the presence of an affiliated corporation."  *Papa* v. *Katy Indus., Inc.*, 166 F.3d 937, 940 (7th Cir. 1999).  Indeed, employees may be aggregated if a plaintiff can show (1) that the traditional conditions for piercing the corporate veil are present, (2) that the enterprise split itself into multiple corporations "for the express purpose of avoiding liability under the discrimination laws," or (3) that the parent corporation might have directed the discriminatory act, practice, or policy of which the plaintiff is complaining.  *Id.* at 940–41.  Given that Macaddino has not shown that any of these situations applies to this case, however, her argument is unpersuasive.

[14] Defendants also argue that events underlying Macaddino's retaliation claim that took place prior to April 1, 2011 are time-barred.  But Macaddino's response brief indicates that her retaliation claim is based solely on her August 29, 2011 termination (dkt. 143 at 8) and it is undisputed that this event falls within the 300-day limitations period.

[15] The parties agree that April 1, 2011 serves as the cut-off date for actionable conduct.

that there has been a pattern or policy of discrimination continuing from outside the limitations period into the statutory limitations period, so that all discriminatory acts committed as part of this pattern or policy can be considered." *Id.* (citation omitted)

The Supreme Court has explained that "[t]he doctrine operates differently according to the type of discriminatory act alleged—'discrete' discriminatory acts or acts contributing to a hostile work environment." *Lucas* v. *Chi. Transit Auth.*, 367 F.3d 714, 723 (7th Cir. 2004) (citing *Nat'l R.R. Passenger Corp.* v. *Morgan*, 536 U.S. 101, 114–15, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)). With regard to the former, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S. at 113. "Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify," and a Title VII plaintiff cannot avoid the limitations period by arguing that discrete acts are "plausibly or sufficiently related." *Id.* at 114. In contrast, the very nature of a hostile work environment claim involves repeated conduct and, therefore, "a hostile-work-environment charge is timely as long as '*any* act falls within the statutory time period,' even if the charge encompasses events occurring prior to the statutory time period." *Adams* v. *City of Indianapolis*, 742 F.3d 720, 730 (7th Cir. 2014) (emphasis in original) (quoting *Morgan*, 536 U.S. at 120).

A.      **Disparate Treatment Claim**

Defendants assert that discrete acts of discrimination underlying Macaddino's disparate treatment claim that occurred prior to April 1, 2011 are time-barred, including HOLDCO's hiring of Solganik instead of Macaddino as Director of Leasing in 2007, HOLDCO's failure to promote Macaddino to that position, HOLDCO's treatment of Macaddino on certain deals, and Macaddino's March 2011 performance review. Plaintiff responds that the discriminatory acts that comprise her disparate treatment claim are acts that she had no knowledge of and are,

therefore, not "discrete acts" from which the time to file a charge runs. Neither party cites case or statutory authority.

As an initial matter, Macaddino does not argue that HOLDCO's 2007 hiring of Solganik instead of Macaddino as Director of Leasing was discriminatory and, plainly, that event is time-barred. *See Morgan*, 536 U.S. at 114 ("Discrete acts such as . . . failure to promote, denial of transfer, or refusal to hire are easy to identify."). Nor does she appear to pursue any claim that she was denied promotion to a Director of Leasing position during the spring of 2011. That said, Macaddino has not made entirely clear what her disparate treatment claim is. Her response memorandum discusses only discrimination in "assignment and compensation." She argues that Solganik's decisions, including denial of box store renewal commissions to plaintiff while allowing such payments to Leeds, discipline notices based on knowingly false allegations of failure to communicate with clients, and being required to present more information to get deals approved than was required of Leeds, resulted in unequal pay for equal work. She further argues that certain discriminatory acts were hidden from her, such as events where Leeds received a commission on deals comparable to deals in which she did not and different requirements for documentation on deals than was required of Leeds.

To the extent Macaddino claims that she was being denied commissions where Leeds was receiving them, her claim did not accrue and the statute of limitations did not begin to run until she knew or had reason to know of conduct that reasonably should have put her on notice that she should assert her rights. *See Cada* v. *Baxter Healthcare Corp.*, 920 F.2d 446, 449–50 (7th Cir.1990) (statute of limitations in discrimination cases begins to run when plaintiff discovers injury). Defendants contend that Macaddino had reason to know of the alleged disparate treatment at least by the time in 2009 that she complained to O'Connor and certainly by

June 2010 when she advised O'Connor that Leeds' deals were not subjected to the same level of scrutiny as hers. Although it is doubtful that the employer's action, if proved, is an adverse action under Title VII because Macaddino does not contend that her compensation was reduced as a result, if it is such, events underlying this claim occurring prior to April 1, 2011 are time-barred.

With regard to her claim that she did not receive certain commissions because of discrimination, however, defendants do not acknowledge that not only the discriminatory decision but the discriminatory act of paying an employee pursuant to a discriminatory decision is an unlawful employment practice. Under what is called the Lily Ledbetter law, codified at 42 U.S.C. § 2000e-5(e)(3)(A), when an employee is affected by application of a discriminatory compensation decision or other practice, a new unlawful employment practice occurs even though the discriminatory decision was made long before. Thus, if Macaddino can show that, at any time after April 1, 2011, she received lower compensation than she would have received but for the discrimination, she may pursue her claim.

### B. Sexual Harassment Claim

In her sexual harassment claim, Macaddino alleges that she was subjected to a hostile work environment and was forced to endure sexually harassing comments from 2005 through 2011. Unlike discrete acts of discrimination, a hostile work environment claim "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Morgan*, 536 U.S. at 117 (citation omitted). Accordingly, a hostile work environment claim will not be time-barred "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

In this case, while many of the comments underlying Macaddino's hostile work environment claim occurred prior to April 1, 2011, at least three were made in 2011. Specifically, Macaddino alleged in her complaint and testified in her deposition that two executives made inappropriate remarks on separate occasions, and that Solganik and McGuiness engaged in a conversation regarding the androgynous nature of a female car sales associate's body.[16] As alleged, these comments are part of the same unlawful employment practice as the pre-2011 remarks—namely, sexual harassment. Therefore, the pre-2011 conduct underlying Macaddino's sexual harassment claim is not time-barred.

Defendants assert that Macaddino believed that the pre-2011 comments constituted sexual harassment when she complained to Lithgow in 2009 and O'Connor in 2010. Thus, defendants argue, Macaddino could have filed a claim for sexual harassment with respect to these events. As the Supreme Court stated, however, Title VII "does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability." *Id.* at 118. Indeed, it is irrelevant whether Macaddino could have filed suit with respect to the comments made prior to 2011 because an employee need only file a charge within 300 days of *any* act that is part of the hostile environment. *See id.* Because Macaddino filed a charge within 300 days of some of the acts underlying her hostile work environment claim, the conduct falling outside of that 300-day time period is not time-barred.

---

[16] Although it is possible that these events took place prior to April 1, 2011, thus barring Macaddino's entire sexual harassment claim, the parties do not dispute that these events occurred after April 1, 2011. Therefore, the court will assume that these events took place within the 300-day time period.

## III.    Additional Arguments

### A.    Disparate Treatment Claim

Defendants assert that Macaddino's disparate treatment claim fails because, among other reasons, Macaddino did not experience an adverse employment action prior to her termination. "The requirement that a plaintiff show she suffered an adverse employment action as a result of her employer's alleged discrimination is an element of any Title VII claim." *Chaib* v. *Indiana*, 744 F.3d 974, 982 (7th Cir. 2014). Although the definition of "adverse employment action" is generous, "not everything that makes an employee unhappy is an actionable adverse action." *Nagle* v. *Vill. of Calumet Park*, 554 F.3d 1106, 1116 (7th Cir. 2009) (citation omitted) (internal quotation marks omitted). Indeed, "an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm." *Atanus* v. *Perry*, 520 F.3d 662, 676 (7th Cir. 2008) (citations omitted) (internal quotation marks omitted).

For purposes of Title VII, adverse employment actions "generally fall into three categories:  (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton* v. *Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011). Here, Macaddino suggests that three events constituted adverse employment actions:  HOLDCO's refusal to pay Macaddino box store renewal commission while allowing Leeds to receive those payments, discipline notices based on allegations of Macaddino's failure to communicate with brokers, and being required to present more information to get deals approved than was required of Leeds. (Dkt. 143 at 8.)

The written warning addressing complaints lodged by brokers is analogous to a negative performance evaluation and therefore cannot, without evidence of disparate treatment, constitute an adverse employment action. *See Sublett* v. *John Wiley & Sons, Inc.*, 463 F.3d 731, 739 (7th Cir. 2006); *Hilt-Dyson* v. *City of Chi.*, 282 F.3d 456, 466 (7th Cir. 2002). Further, while Macaddino maintains that she was forced to provide more documentation than Leeds on certain deals, the assignment of additional work outside the scope of one's job responsibilities alone is not an adverse action, and Macaddino does not allege that her compensation was reduced as a result. *See Griffin* v. *Potter*, 356 F.3d 824, 829 (7th Cir. 2004). As stated above, however, if she can show reduced compensation as a result of disparate treatment those deals that are not time-barred would be adverse employment actions.

**B.     Sexual Harassment Claim**

Next, defendants maintain that Macaddino's claim for sexual harassment fails because the alleged harassment was not severe or pervasive enough to create a hostile work environment. To survive summary judgment on her sexual harassment claim, Macaddino must show that "(1) she was subjected to unwelcome harassment, (2) the harassment was based on her sex (3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere, and (4) there is a basis for employer liability." *Kampmier* v. *Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007) (citation omitted). The third prong of this test—the severity or pervasiveness of the harassment—has both an objective and a subjective component. *Lapka* v. *Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008). A plaintiff may satisfy the subjective prong by presenting evidence that she in fact perceived her workplace as hostile or abusive. *Hilt–Dyson*, 282 F.3d at 463. In determining whether a workplace is objectively hostile, courts consider the totality of the circumstances, including the frequency and

severity of the discriminatory conduct; "'whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *See Faragher* v. *City of Boca Raton,* 524 U.S. 775, 787–88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (quoting *Harris* v. *Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)); *Gleason* v. *Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) ("Title VII is not directed against unpleasantness *per se* but only . . . against discrimination in the conditions of employment." (alteration in original) (citation omitted)).

Macaddino's sexual harassment claim is based on a series of comments made between 2005 and 2011. (*See* Defs.' L.R. 56.1 ¶¶ 41–45, 55.) Macaddino's complaints to Lithgow and O'Connor are sufficient evidence that the environment was subjectively hostile. Defendants argue that the totality of the circumstances indicates that the comments complained of did not render Macaddino's workplace objectively hostile. While unpleasant, they concede, Macaddino's allegations amount to the "occasional vulgar banter" that courts have consistently found insufficient to survive summary judgment on a hostile work environment claim. *See, e.g.*, *Kampmier*, 472 F.3d at 941 ("The occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable." (citations omitted) (internal quotation marks omitted)); *Moser* v. *Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005) (finding comments made "in the context of heedless jokes, as opposed to serious or threatening comments," insufficient to constitute actionable harassment). Indeed, courts have found that under some circumstances, even uninvited physical contact of a sexual nature does not create an objectively hostile environment. *See, e.g.*, *Adusumilli* v. *City of Chi.*, 164 F.3d 353, 361–62 (7th Cir. 1998) (finding ambiguous

comments and four isolated incidents of unwanted touching insufficient to survive summary judgment).

Defendants attempt to isolate each specific instance that Macaddino recalled during her testimony without acknowledging that she testified that Solganik's conduct was chronically inappropriate towards and her female colleague Janice Cohler. For example, Plaintiff testified that she told O'Connor in 2009 that Solganik "doesn't act the way with me that he acts with Doug [Leeds] or any of the guys in the whole area ever. He never escalates, he never slams doors, he never throws leases on the ground." (Macaddino Dep. at 195: 3–6.) She testified that Solganik "made inappropriate [sexual] comments regularly from '07 through 2010." (*Id.* at 203: 14–15.) He called her a "bad girl" during a Leasing Board meeting in 2009. (*Id.* at 210: 12.) Read fairly, Macaddino's deposition does not convey a few isolated remarks justifying summary judgment in defendants' favor. Rather, Solganik, her direct supervisor, according to Macaddino, regularly humiliated her in front of others by using language implying her inferiority as a woman. The Seventh Circuit has emphasized, "'[C]ourts should not carve up the incidents of harassment and then separately analyze each incident, by itself, to see if each rises to the level of being severe or pervasive.' Instead, a look at the totality of the circumstances must be had." *Hall* v. *City of Chi.*, 713 F.3d 325, 331 (7th Cir. 2013) (citations omitted). Suffice it to say, there is sufficient evidence in the record from which a jury could infer that Solganik created a hostile work environment through his derogatory treatment of and sexually inappropriate comments to Macaddino and other women in the workplace. (Defs.' L.R. 56.1 ¶ 44.) .

Next, defendants argue that even if the harassment was severe or pervasive, there is no basis for employer liability because human resources conducted a prompt and thorough investigation of Macaddino's claims. "The standard for employer liability turns on whether the

alleged harasser was the plaintiff's supervisor, instead of a mere co-worker." *Rhodes* v. *Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004) (citations omitted). If the harassment is perpetrated by a supervisor and the harassment culminates in a tangible employment action, the employer is strictly liable. *Vance* v. *Ball State Univ.*, --- U.S. ---, 133 S. Ct. 2434, 2439, 186 L. Ed. 2d 565 (2013). In contrast, if the harassing employee is merely the victim's co-worker, "the employer is liable only if it was negligent in controlling working conditions." *Id.*

In this case, Solganik, the primary actor, was Macaddino's direct supervisor. A supervisor is an employee who has the authority to effect a significant change in employment status, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 2443 (citation omitted) (internal quotation marks omitted). Solganik was a senior vice president of HOLDCO and the Director of Leasing. Although it is unclear whether Solganik had the authority to fire Macaddino, defendants suggest that Young, also a senior vice president, had that right, thus implying that Solganik had the authority as well. Moreover, HOLDCO empowered Solganik to discipline Macaddino. Indeed, the May 12, 2011 written warning given to Macaddino bears Solganik's signature. Thus, at least, Solganik's authority to discipline Macaddino makes him her supervisor for purposes of Title VII. *See Parkins* v. *Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir. 1998) (holding that supervisory authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee"); *Gracia* v. *Sigmatron Int'l, Inc.*, No. 11 C 7604, 2013 WL 5782359, at *6 (N.D. Ill. Oct. 25, 2013) ("[A]lthough Silverman may not have been able to fire Gracia by his lonesome, the fact that he could discipline her makes him her supervisor for Title VII purposes." (internal citation omitted)).

As Macaddino's supervisor, however, Solganik did not take a tangible employment action against her. The unfavorable March 2011 performance review and the May 2011 written warning were not accompanied by a material job consequence such as a reduction in compensation. *See Porter* v. *City of Chi.*, 700 F.3d 944, 955 (7th Cir. 2012). And sexual harassment alone cannot constitute a tangible employment action. *See Gawley* v. *Ind. Univ.*, 276 F.3d 301, 311 (7th Cir. 2001); *Stanfield* v. *Dart*, No. 10 C 6569, 2012 WL 6720433, at *7 (N.D. Ill. Dec. 27, 2012).

To escape liability, therefore, HOLDCO may establish as an affirmative defense that (1) it "exercised reasonable care to prevent and correct any harassing behavior" and (2) that Macaddino "unreasonably failed to take advantage of the preventative or corrective opportunities that" HOLDCO provided. *Vance*, 133 S. Ct. at 2439 (citations omitted). HOLDCO adopted a new employee handbook in 2009 containing company policies on sexual harassment and discrimination in the workplace, but this fact alone is not conclusive proof that HOLDCO exercised reasonable care to prevent harassing behavior. *See E.E.O.C.* v. *Mgmt. Hospitality of Racine, Inc.*, 666 F.3d 422, 435 (7th Cir. 2012). After Macaddino informed Lithgow that Solganik had made inappropriate comments, Lithgow gave Solganik a verbal warning. Macaddino complained again in 2010, and O'Connor investigated, ultimately concluding that she could not corroborate Macaddino's complaints of harassment. Nevertheless, she advised Lithgow to reprimand Solganik, which he did. O'Connor also asked HOLDCO management to investigate Macaddino's complaints, but the bulk of both O'Connor's and HOLDCO management's investigation concerned Macaddino's alleged differential treatment with respect to her deals, not sexual harassment. Furthermore, given that Solganik discussed the androgynous nature of a female car sales associate's body with McGuiness in 2011 in Macaddino's presence,

a reasonable jury could conclude that neither O'Connor's investigation nor HOLDCO's harassment policy were effective in correcting Solganik's harassing behavior.

In addition, a genuine issue of material fact exists as to whether Macaddino unreasonably failed to take advantage of corrective opportunities to avoid harassment. Macaddino reported harassment to Lithgow and O'Connor in 2009 and 2010, respectively, yet alleges that she continued to experience harassment in 2011. Further, although Macaddino stated that she "would not be rehashing complaints from the past at this time" in response to an inquiry from O'Connor in 2011 (Defs.' L.R. 56.1 ¶ 67), a reasonable jury could find that Macaddino was uncomfortable reporting harassing behavior to O'Connor after her previous complaints had failed to alleviate the problem. *See Thomas* v. *Comcast of Chi.*, No. 11 C 1209, 2012 WL 3205008, at *7 (N.D. Ill. Aug. 2, 2012) ("A reasonable jury might, in light of the facts provided, find that Thomas was afraid of or uncomfortable reporting someone who was her direct supervisor."). Therefore, fact issues remain with respect to HOLDCO's liability for the creation of a hostile work environment.

### C.     Retaliation Claim

Macaddino claims that she was terminated because she complained of sexual harassment and disparate treatment. (*See* dkt. 143 at 8.) Defendants maintain that summary judgment is appropriate because Young made an independent decision to terminate Macaddino and had no knowledge of Macaddino's past complaints.

Macaddino can oppose defendants' motion for summary judgment under the indirect or direct methods of proof. Macaddino proceeds with the direct method. Pursuant to this method, a plaintiff must establish with direct or circumstantial evidence (1) that she engaged in protected conduct, (2) that she was subjected to an adverse employment action, and (3) that there was a

causal link between the protected activity and the employment action. *Hobgood* v. *Ill. Gaming Bd.*, 731 F.3d 635, 642 (7th Cir. 2013). The parties do not dispute that Macaddino engaged in protected conduct or that Macaddino's termination constituted an adverse employment action. Only the third element is at issue.

Claims for unlawful retaliation under Title VII require proof that the desire to retaliate was the but-for cause of the challenged employment action. *See Univ. of Texas Sw. Med. Ctr.* v. *Nassar*, --- U.S. ---, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013); *Hobgood*, 731 F.3d at 643. Macaddino has not presented any direct evidence and instead points to circumstantial evidence of retaliation, which she is entitled to do. Indeed, she may satisfy the direct method of proof with "a 'convincing mosaic' of circumstantial evidence." *Rhodes*, 359 F.3d at 504 (citation omitted). Courts in this Circuit have recognized four primary categories of circumstantial evidence: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Hobgood*, 731 F.3d at 643–44 (citations omitted) (internal quotation marks omitted). These categories, however, are not exclusive. *Id.*

Macaddino first points to the discussion among O'Connor, Lithgow, and McGuinness about firing Macaddino in 2010 as evidence that she was terminated because of her protected conduct. The conversation to which Macaddino refers is drawn from O'Connor's deposition, in which O'Connor testified that HOLDCO considered terminating Macaddino in 2010 prior to the investigation of Solganik's conduct. (*See* O'Connor Dep. at 141.) According to Macaddino, "[w]hen considered in the context of the record of a high performing employee leasing more

property than anyone else, Defendant's position that Plaintiff lost all people skills and suddenly 'devolved' into a bully, meets her burden to prove causation." (Dkt. 143 at 9.) Macaddino also contends that O'Connor exhibited prejudice toward Macaddino by characterizing Macaddino's complaints as "crap," referring to Macaddino as a "jerk," and failing to follow up on statements made by Berg regarding differential treatment with respect to certain deals. Further, Macaddino challenges the credibility of defendants' witnesses who claim that Young had no knowledge of the issues with Solganik. She described them as having worked together for many years and being "budd[ies]." (Macaddino Dep. at 242: 10.) Macaddino also questions the timing of events as suspicious, because a very successful employee who had been described as "golden child" (Pl.'s L.R. 56.1 ¶ 2) and not easy to manage (*id.* ¶ 3) was suddenly being fired for a complaint about her poor communication with a few brokers.

Macaddino first came forward in early to mid-2009. After her investigation was completed a year later, Lithgow reprimanded Solganik in writing. Within a week, Lithgow, Solganik, and O'Connor met with Macaddino about performance issues. O'Connor reports that Macaddino was combative but agreed to make the changes required. (Dkt. 138-25 at 7–8.) She was fired thirteen months later.

Although there is considerable documentation in O'Connor's notes that Macaddino was not meeting Solganik's and, later, Young's performance expectations, the facts interpreted in a light most favorable to the plaintiff are sufficient to go to the jury as to whether she would have been fired had she not engaged in protected conduct, *i.e.*, come forward with her complaint about Solganik. As in *Hobgood* v. *Ill. Gaming Bd.*, 731 F.3d 635, 647–48 (7th Cir. 2013), the court is satisfied that Macaddino has presented enough "bits and pieces" to let a jury decide the retaliation claim. *See Malin* v. *Hospira, Inc.*, 762 F.3d 552, 560 (7th Cir. 2014) (reversing

summary judgment even though three years had passed between complaint of sexual harassment and termination and stating, "[A] long time interval between protected activity and adverse employment action may weaken but does not conclusively bar an inference of retaliation." (citations omitted)).

Issues relating to whether the stated reasons were pretextual entail the credibility of witnesses involved and therefore are best left for the jury to decide.[17]

## CONCLUSION AND ORDER

For the foregoing reasons, defendants' motion for summary judgment (dkt. 135) is granted as to Inland American Retail Management, LLC and is otherwise denied. The case is set for status on April 7, 2015 at 11:00 to set a trial date. The parties are directed to explore potential settlement and advise the court whether referral to a magistrate judge for a settlement conference would be useful.

Date: March 18, 2015

_Joan H. Lefkow_
United States District Judge

---

[17] In their reply brief, defendants request that the court strike a large portion of the emails contained in Macaddino's appendix "because these exhibits were attached in violation of the Court's orders." (Dkt. 148 at 5.) Defendants are correct that on April 2, 2013, the Magistrate Judge, in denying defendants' motion for a protective order and ordering defendants to produce Macaddino's email account, directed that if either party wished to use any email or attachment from the production in a deposition or dispositive motion, "that party shall identify the email or attachment to be so used . . . no less than [seven] days before the deposition or the filing of the dispositive motion," provided that the email or attachment had not otherwise been produced in the case. (Dkt. 49.) The notice period was later enlarged to ten days. (Dkt. 63.) Macaddino does not dispute that she attached the emails without giving notice to defendants, thus violating the court's order. The request to strike is granted. The court also grants defendants' request to strike exhibits not previously produced in this litigation. The court has concluded that summary judgment must be denied without considering the stricken documents.